Thank you, your honor. At the page 28 of our opening brief, our blue brief, we cite a fifth-degree case. Can you say your, what's your name? I'm sorry, I didn't catch it. My name is Homer Hooversall. I'm from Helena, Montana, and I'm appearing on behalf of the appellant Arielle Cowser. I'd like to use five minutes and 30 seconds for my opening, and I'll reserve two minutes. As I stated, at page 28 of our blue brief, we cite a Fifth Circuit case. It's called Whittington. And Whittington was cited in the Ninth Circuit case, Vavages. Basically, Whittington and Vavages stand for the proposition that the Fifth Amendment protection against compelled self-incrimination does not protect a lie yet to be told. And that's... I'm sorry, could you repeat that? Does not protect what? A lie yet to be told. It does not protect testimony that has not occurred yet. And so... It doesn't protect a lie yet to be told? That's the exact language... But in this instance, there were two versions, but he told both of them. Not really, Your Honor. The first thing that he said was that he'd loaned this guy $1,200, and he intended to get that $1,200 back. And then he went on and said what happened, essentially what we wanted to assert, the evidence that we wanted to assert from our defense point of view, was the facts that, first, he told these two people to stay in the car. And secondly, they ignored what he said, and they came in with guns, and they basically committed the robbery themselves. And those are the facts that we wanted to elicit. Ariel Kauser was charged with conspiracy to commit a Hobbs Act robbery, and she was charged... Okay, but the problem is that he also said, completely contrary to her story, that he drove her there, and he told her to go in and talk to them, and so on. So his story, it seems to me that if he said all... This is the part I've never understood about this case, that that story is not helpful to her basic version. Your Honor, I would have taken Defendant's Exhibit 500, which was a... And I think it's submitted under Defendant's Exhibit 501 as well, and that's what the district court referred to in the transcript. But that was a video of Ms. Kauser being dropped off at the residence in a red Ford Escort. To be honest, I have not been able to get hold of that video, and I will continue to try, but my understanding is that it's not anywhere near as clear as you say it is. It's pretty clear. I mean, the cross-examination from the transcript, I think, establishes pretty much what it says, but we have the exhibits. We can certainly provide them to the court. All right. So then he's a liar. I mean, it's very strange. So if that's true, then he lied, then his whole story was a lie because he said otherwise. Well, we don't know what he was going to say, because this is the reason why the matter, I think, should be reversed. This is where the district court erred. The district court took a blanket invocation of the Fifth Amendment protection. Let me ask you about that. Let me ask you about that, Mr. Russell, because I understand that you had an opportunity to ask the questions that you wanted to ask of Mr. Franklin, and he said he invoked the Fifth. Is that right? I mean, how in your mind should this have played out, or what are you saying should have happened here? Because from what I can tell, you were given an opportunity. Mr. Franklin clearly expressed that he would invoke the Fifth Amendment. So what do you think should have happened? Well, I think that the district judge should have told him, look, you can't make a blanket invocation. And if counsel wants to ask you questions, you need to listen to the question posed and answer the question posed or assert your Fifth Amendment right against compelled self-incrimination. And you mean that should have been done question by question in front of the jury? No, not in front of the jury in the offer of proof. That way we would have been able to know, we would have been able to determine exactly what he was going to say to the questions. But he basically said, I asked him specifically, so if I go through and ask you questions regarding what occurred on March 8, 2000, whatever the year was, are you going to invoke your Fifth Amendment protection? And he said, yes. Did you then try to ask him individual questions? Did the judge say you couldn't? The judge did not say that I couldn't. Right. So that's the issue that I have. I'm trying to figure out what. I'm sorry, I'm sorry, I'm having some connectivity issues. I don't know if you can hear me, but it looks like you had the opportunity to ask him questions and that you didn't. And so I'm trying to figure out how the district court, I mean, and so then the district court is seeing that he is invoking the Fifth Amendment to every question that you did ask. So I'm not quite sure how you wanted those statements that you've outlined to come out in front of the jury. Well, to begin with, we had a jury sitting there waiting. We had three additional witnesses. And Mr. Franklin specifically said, if you continue to ask me questions, all I'm going to do is assert the Fifth Amendment right against compelled self-incrimination. And so for me as defense counsel, wasting time saying, well, what did you and I specifically asked him, what were you doing on March 8th? I plead the Fifth. Were you there at the residence? I plead the Fifth. I mean, it would have been a waste of time in my view. Exactly, which is what the judge said. So unless you have something you can point to that as to which invoking the Fifth would have been inappropriate in the line of questions of what happened that night, and you didn't ask them. I mean, if you had something that you thought he wasn't going to invoke the Fifth of, you could have asked him. Well, in my view, it would have been a waste of time. Okay, so is the problem that he invoked the Fifth? So you seem to be arguing inconsistently. You're saying there was a generic blanket invocation of the Fifth Amendment, but you're recognizing that every specific question he would have invoked the Fifth Amendment anyway. So unless you have some specific question as to which he would have invoked the Fifth inappropriately, then the fact that it was done generically isn't the problem. Well, I think that the district court recognized that you can't do a blanket invocation of the Fifth Amendment. What do you mean by a blanket invocation? I mean, he is taking the position that as to everything that happened that night, he's going to invoke the Fifth Amendment. Is that what you mean by the blanket invocation? Yeah, I refuse to answer any questions about what happened on March 8th. And that's a blanket invocation. And if you had asked him all the individual questions that he had invoked the Fifth, that would have been different? And if he had said the same with regards to each individual question? No, that would not have been a blanket invocation. But even if he would have said Fifth Amendment, Fifth Amendment, I'm trying to figure out what the material difference is on that. And it looks like you didn't press for that. So I'm not quite sure if it was a blanket invocation, especially considering everything, you know, his counsel's concern regarding letting him testify. We're almost out of time, but do you have any substantive basis for saying that the Fifth Amendment was improperly invoked? Leave aside this procedural question. Yeah, the substantive basis is that he would have provided exculpatory evidence. If we compare the statements that he made in his first and second hearings, his first and second plea hearings, it was exculpatory for burial causes purposes. I understand that, but what basis is there for believing that he substantively, I mean, that he didn't, leaving aside the blanket nature of what you say is a blanket invocation. I assume he had answered every question you wanted to ask him and said, I invoked the Fifth Amendment. Was there a problem, a substantive problem with that invocation? Yeah, because he hadn't yet told a lie. I mean, there was, we don't know what he was going to say. But I don't understand that part about he hadn't yet told a lie. If you ask him the question and he says, I invoked the Fifth Amendment, because he, if he answered it, he would demonstrate that he had lied and be subject to perjury. Isn't that, that's not appropriate? I think that he could have, well, he was under an obligation to tell the truth. Okay. And so that would have been his shield to any sort of a perjury prosecution. All he had to do was tell the truth. And he had already made the statements under the, in the record, and it was up to the government to, the government could have charged him for either one of the statements that he had already made. If it's believed that he was committing perjury. Okay, your time is up and we will give you a moment. Thank you. Mr. Schulte. Good morning, your honors. May it please the court. My name is Dwight Schulte. I represent Keelan Franklin in his appeal of his sentence that we believe is unconstitutional in violation of his Fifth Amendment right to due process. Mr. Franklin received a sentencing enhancement for obstruction of justice based almost exclusively on the statements of one cooperating co-defendant, Mr. Gerald Hiller. These statements were made out of court. They were unsworn. They were untested by cross-examination, and we do not believe that they meet the minimal indicia of reliability standard as set forth in Pimentel Lopez. Your honors, the government in its response to this issue has cited essentially five arguments as to why they believe these out-of-court statements were corroborated. However, if we evaluate each of these arguments in turn, each one has a fatal flaw. Then adding them together doesn't make the argument stronger if each leg of that argument fails. First, your honors, the government argues that Hiller produced two notes that corroborate his statements. However, these notes, one allegedly to Mr. Franklin and one allegedly from Mr. Franklin, have no identifying characteristics at all, were produced by Mr. Hiller, which is unique that he would have his note that he gave Mr. Franklin to produce in the first place. Secondly, your honor, he claims that he was slapped around at the request of Mr. Franklin. However, when we review the record and the testimony of Special Agent Bowen, he testified that there are countless reasons in a correctional facility for something like that to happen. They did not investigate it. They didn't even identify who did it, let alone whether it was related to this case. In your view, counsel, why would Mr. Pritch request a transfer to another detention center if Mr. Franklin would not have in fact threatened Mr. Pritch? That's a great question, your honor. In Montana, your honor, Cascade County is known as a very poor place to be as an inmate. There are a myriad of reasons, again, that somebody could request a transfer. And when we look at the testimony of Mr. Pritch, it requires some extrapolation of nefarious intent to reach a level of coercing. The testimony from Special Agent Bowen is that Mr. Pritch said Mr. Franklin told him to be cautious because paper follows you around. And that is the extent of Mr. Franklin's alleged contact with Mr. Pritch at the Cascade County Detention Facility. Wasn't there also, and correct me, but as I understood it, there is a note from Pritch to Franklin, which was introduced by Franklin. So that's physically, you know, we have some physical connection there that it wasn't created out of whole cloth. Am I mistaken there? Very, very briefly, your honor. There is a mistake in the government's brief representing that that note was from Mr. Pritch, excuse me, to Mr. Pritch. What we have is first, at excerpts of record 196, the alleged note from Mr. Franklin to Mr. Hiller. Then at excerpt of record 197... Counsel, I'm looking at, there are many note numbers. Exhibit D5, I took my medicine, that's all I know about all of this. Correct, your honor. And that note was represented as being from Mr. Hiller to Mr. Franklin, not from Mr. Pritch. And that was the testimony at trial. There are two separate notes from Hiller? So one note from Hiller represented as being to him from Mr. Franklin. The second note, Mr. Hiller says he wrote to Mr. Franklin in response. However, it's unclear why he would have a note that should have been in Mr. Franklin. I understand that, but exhibit D5, which starts out, I took my medicine. Who is that from and who is that to in your view? That was from Mr. Hiller to Mr. Franklin. Okay, which is, all right, got it, thank you. So your honor, there is no extrinsic corruption from Mr. Pritch. We have Mr. Pritch's testimony relayed through Special Agent Bowen that Mr. Franklin said, be careful, paper follows you around. And then after that, or independent of that, he asked for the transfer and he got a transfer. Is that correct? Your honor, I do not know that we do not have that in the record. Special Agent Bowen that he testified that he did request a transfer. Okay, that's in the record.  However, Special Agent Bowen did testify that Pitch's and Hiller's statements did not corroborate each other because Pitch was not asked to change his testimony. And that is what Mr. Hiller presented. Both of these interviews happened on the same day in preparation for trial after Mr. Franklin's failed change of plea. I mean, these are handwritten notes. Did anybody do any handwriting analysis? No, your honor. The government did not investigate the notes in any way outside of Mr. Hiller's statements. There is no handwriting analysis. There are no identifying factors on the note that would link it to Mr. Franklin. And I think it is important that these statements do not have external consistency as discussed in Berry. Pitch and Hiller do not corroborate each other. And Special Agent Bowen did admit that. And what we have is Mr. Hiller. Well, they do not corroborate in terms of talking about the same things. They corroborate the atmosphere but not specific events. Would that be fair? I think that, your honor, Mr. Pitch does not have a very different atmosphere as alleged by Mr. Hiller. Mr. Pitch said, he told me to be careful because paper follows me around. Well, that sounds fairly ominous to me. Now, maybe if I were in the prison, it would have seemed less ominous. Maybe I watched too many Godfather movies. But that sounds pretty ominous to me. Because then, which I was going to follow up, so the district court has all this before the judge. We know that hearsay is generally permitted. There has to be some minimal level of reliability and de-shove reliability. And the district judge has an abuse of discretion standard. Is that fair? Your honor, I believe due to the constitutional issue that this is a de novo standard. That we are dealing with Fifth Amendment constitutional issues for a de novo standard. What's your authority for that? Your honor, my authority is Neal v. Shimoda, 131 F3D 823. I also was looking at interpretation and application of guidelines. The guideline at issue being guideline 6A 1.3A. Resolution of disputed factors, which specifically references sufficient indicia of reliability. The site for that is United States v. Calderon Espinosa, F69. If it was just the guideline, it would be an abuse of discretion standard. Your honor, with interpretation and application of that, i.e. is there sufficient indicia of reliability, we would believe de novo. Looks like all the cases that have reviewed this similar issue that we have in our circuit. Apply a minimum level of indicia of reliability with abuse of discretion. Your honor, I did go back to Pimentel-Lopez to try and resolve that conflict. I was not able to find the standard for Pimentel-Lopez. But I do believe the case that we have before it in terms of factually is very similar. We have people that testified at trial, but not about this exact issue. We have a codefendant making statements that was corroborated in Pimentel-Lopez by another person in a pretrial interview, but not at trial. And I think when we compare the facts, we're looking in a very similar setting as Pimentel-Lopez in terms of facts before the court to determine if we meet that sufficient indicia of reliability standard. Yes, sir. Your time has expired. So thank you very much. Thank you, Your Honor. Mr. Roscoe. Good morning, Your Honors, and may it please the court. My name is Tim Roscoe, and I'm an assistant U.S. attorney here in Montana out of the Missoula area. I guess I assume you'd want me to go back and start with the issues in the Couser case. So, Your Honors, as it relates to the blanket invocation question, that, in our view, is process-oriented. A blanket invocation would be if Mr. Franklin said, I'm going to take the fifth, or his lawyer in this case said, Mr. Franklin's going to take the fifth, and then he's never called to the stand at all. And the focus here is that Judge Malloy, the district court, did exactly what he should have done by following the process that's outlined in this court's decision and more, and saying, we're going to bring Mr. Franklin in, we're going to put him under oath, and we're going to let you ask him questions, and then we're going to see how it unfolds. And the court had the benefit of the two prior change of plea hearings in order to be able to compare the statements from those hearings with whatever information Mr. Franklin was willing to provide under oath during the trial setting. So it's the process that the court followed as opposed to just allowing Mr. Franklin's lawyer to say, he's going to invoke, and that's it, and saying, okay, well, then we're going to move along, I'm not going to even follow this process. So it's the procedure that's in place that was followed that prevents this from being a blanket invocation. I would say, I don't think Mr. Huvestal's wrong that Mr. Franklin was not going to answer those substantive questions, but again, we have the two prior change of plea transcripts. We know that he committed perjury once already, and the problem for him is, how is he not going to be in a position where he's faced with that? My understanding of Mr. Huvestal's argument, both in the brief and more succinctly here, is that there actually wasn't a direct contradiction. He didn't have to commit perjury in order to accept one or the other. I guess that's because he construes the second version as admitting that he knew these people had the guns, but not admitting that he went there to rob them. I think that's right. I went there to get the money or the guns, but he didn't say I went there to get it by robbing them. I think you're right, Your Honor, about that argument. We just have a fundamental disagreement among the parties about the seminal facts as it relates to those two proceedings. We pointed out four particular inconsistencies at page 26 of our brief. It may be four inconsistencies, but I guess what he's saying is he could testify if he doesn't get into those four inconsistencies consistently. That was the point we made to the district judges. There's no way that one party or the other isn't going to want to get into the entire content of one statement or the other, depending on what version he elects if he's forced to testify at trial. There's no way that those inconsistencies aren't going to come back to haunt him because one party or the other is going to want to try to establish whatever version of events they think is accurate. In our case, we think the second change of plea hearing is the accurate proceeding. It dovetails with all of the evidence that had come in during the government's case at trial to that point, which the district court acknowledged. And there was no way if Mr. Franklin reverted back to the first statement that we weren't going to impeach him with the second and no way if he adopted the second that Mr. Huvestal wasn't going to impeach him with the first. And there were fundamental differences that matter for purposes of what he wanted to elicit from his Couser's case and what we would want to elicit to show knowledge of the conspiracy. But I think what Mr. Huvestal seems to be arguing, there were some, and just as Judge Berzon referenced, there were some statements that he made at the first change of plea hearing and at the second change of plea hearing that were consistent. And that, I guess, arguably, although I'm not quite sure how, it might have supported Ms. Crouser. And I think one of them was Ms. Couser was sent in because I felt like if she could talk to them, she might be able to convince them just to give me the money so I could leave. And then Couser went in with the objective of trying to talk to them into working with me to get my money. I believe that's what Ms. Crouser was trying to get out to corroborate that she'd gone in there first. So could that have come in in any way? So that's a really interesting point, Judge McGeough, that I think is really important to the issue of also helpfulness in this case. You're right that what Mr. Franklin said at the first change of plea hearing is I sent Ariel Couser in first in order to try to talk to the victims and see if they would give me my money back. That's not what the defense argued at trial. What they argued at trial is that she was dropped off entirely differently in a different vehicle. That's a different issue. That's whether or not it would have been helpful to her or if it was harmless in not coming in. But the fact that he wanted it to come in or they wanted it to come in, could that have come in? In other words, could the statement from the first change of plea hearing that I sent Ariel Couser in first come in at the trial and not be inconsistent? He did not say anything inconsistent about that at the second change of plea. He just talked about his intent at the second change of plea from what I can tell. Everything else was the same. I'm just trying to figure out. It's a very interesting question that I find because we do have some strong blanket invocation that that should not be permitted. There could be another instance, maybe not this one, but where somebody had a statement like this that wanted it to come in. Would they be prevented from doing so? Just like Mr. Yeah, I don't know. I mean, we don't know because he didn't ask that question of Mr. Franklin, but you are correct. Judge is a factual matter. There was no inconsistency at the second change of plea hearing with that statement from the first. And that's why I do our reckoning. What's really important about that is it entirely undermines the theory of defense that the defense was putting forward at the trial, especially as it relates to this exhibit 500. So we don't think it would have been helpful to them at all. Why couldn't he simply have saved the fifth about that? Because it slices him at the location and involved in the in the incident. Well, I think he could still invoke the fifth because it still could impact the sentencing to judge. I mean, if he says I said, I mean, even if it wasn't a contradiction, why couldn't he still invoke? Well, I think he could. Absolutely. Because he's still in jeopardy for some of the sentencing issues as well. It's not just perjury that's on the table. He hasn't been sentenced yet. As of Ms. Causer's trial. And if he admits one version or the other, he could risk obstruction. He could risk a leadership enhancement. And if he admits Judge McGee of the statement that he sent Ariel Couser in first, then that could be used by the government of sentencing to say, see, he is in charge. He's directing traffic here. He's telling her to go in. If we even believe that he told the other two to stay in the car, which was what he said at the first change of plea. He's telling them to stay in the car. He's directing traffic there. So he's in charge of this. So that placed him in jeopardy as it related to this. Another non-contradiction is he didn't say the second time that he didn't tell him to stay in the car. Right. He says he had the gun, but he didn't tell him that he didn't tell him to stay in the car. He didn't say specifically that, Judge. But he did say that we knew we were going there. I was going there to relieve them of drugs and or money. So I think the fair inference from that is we were going there to commit a robbery. Yes. But he didn't say that he knew these guys were going there with guns. The second time he knew they had guns, but he didn't tell them to go in with guns. He never said that. Right. He didn't say one way or the other at the second hearing whether he told them to stay in the car or not. But he admitted that he was aiding and abetting the robbery. So the fair inference being we're going there with a show of force being more than one of us going into the house. What about Franklin sentencing? Can you talk about that a little bit? With respect to the minimal indicia of reliability, what do you think standard of review is at sentencing? Do you have any counter to Pimentel-Lopez? It looks like we have cases that say at this stage in the proceedings, which was the sentencing, that hearsay can come in. But, you know, especially with co-conspirator statements, there has to be a minimal indicia of reliability. And then also cases say it's an abusive discretion review. But Pimentel apparently says otherwise. I'm not sure Pimentel addresses the standard in more detail than the court's other decisions. We think it's abusive discretion. We cited the Ressam case at page 15 of our brief. We think the fact findings are reviewed for clear error. But ultimately the sentencing decision and the evaluation of the reliability of the hearsay are reviewed for abusive discretion. And, Judge, we think there's enough. I'm sorry. Go ahead. So what happened here? Why do you think there's enough minimum indicia of reliability, especially when there's a lot of questions about the note here? I don't know if you've had a chance to see that. I'm sure you have. I have. I actually covered the sentencing in this case for the colleague who had departed our office. But I think what's important about the note, we did not do handwriting analysis, as Judge Berzon pointed out. But what's important about the note is it's entirely consistent with what Mr. Franklin said at the first change of plea hearing. He lists for Mr. Heiler exactly what he wants Mr. Heiler to say, and it's exactly what he said at the failed change of plea hearing. Precisely because he said it, it would be very easy for anybody to write that note. Well, Mr. Heiler was in custody when Mr. Franklin had his first change of plea hearing. There was no transcript that had been requested or ordered or produced at that time. So I don't know that it would have been that easy for him to write a note where he knows exactly what Mr. Franklin said at his failed change of plea hearing. So I think the note offers a significant amount of corroboration. And you could also ask sort of the rhetorical question, why would Mr. Heiler, if he wants to make a statement about this, which he does, why would he also create a note that could possibly be disproved by Mr. Franklin simply providing a handwriting statement to say, look, this handwriting exemplar doesn't match what's in Mr. Heiler's purported note? Not to shift the burden over to Mr. Franklin, but that is something that he could have done. And it's something that could have placed Mr. Heiler in pretty significant peril. So you might ask yourself, well, you can just tell the agent, Franklin is leaning on me. Why do you take the extra step of creating a note that could very easily be proven not to be in your handwriting if one of the other party wants to undertake that analysis? So I think the attempt to sort of parse each individual piece of reliability out fails, because that's the whole point of looking for minimal indicia as you put it all back together. And the note corroborates what Mr. Franklin said at his hearing. There's no reason to create the note when you could just rely on a statement. I think Judge Boggs correctly noted Pitch and Heiler do corroborate one another. And it's basically different tactics that Mr. Franklin is employing to lean on each of them. But telling someone you need to be careful what you say because paper follows you around. But they don't corroborate. For one thing, he was asking Heiler if he was responsible for the other note. He was asking him not to testify. Well, he says in the note, I'd like you, Heiler, to say specific things. He also says in the note, I know that it was Pitch who's already been singing like a bird, I think, were the words that Mr. Franklin used. So it makes sense there, too, as well, that he's saying, Heiler, you haven't said anything yet, so I'd like you to say these things. Pitch, my understanding is you already talked, so you need to be careful what else you say because paper will follow you around. So I think, can you line them up, Judge Berzon, sort of like point by point, word by word and find corroboration? No, but I think it's just two different tactics Mr. Franklin was employing to lean on these two individuals to try to get them to say something that's exactly what he ends up saying during his first failed change of plea hearing. No, Franklin, what is it to say then, trying to get the other one to do what? Not testify at the trial? I think trying, yeah, sorry, I cut you off, trying to get Pitch not to say anything else at all. Basically saying, your paper's going to follow you, so you shouldn't keep talking at all. So it's just different tactics to try to accomplish what he wants in order to get his message before the court. Counselor, can you help me about what was obviously my confusion about Exhibit D5 with the, I took my medicine note as to how that got into the record, who had it? Because your adversary said something about why would this record, this note, you know, be in Hyler's possession? Am I confusing that or what's your understanding? No, you're right about that, Judge Boggs. And I think we do have a mistake in our brief claiming that there was a note related to Pitch as well. Mr. Schulte's right that that is Hyler's, that's a note Hyler said he wrote to give to Franklin. We don't have any information in the record about why Mr. Hyler still had a copy of it. But what he said was, the first note, I think it's D4, is the note I received from Mr. Franklin. D5 is the note I wrote back to him, essentially trying to get him off my back. Okay, but so either he kept his own copy or he used carbon paper. I never sent it. Or he never got a chance to deliver it. We're not sure. We know, I think, I think the record, I think it's in the record that Mr. Hyler was put into solitary after the assault. So maybe they weren't able to communicate with each other anymore. I don't know the details precisely around that, but there's no information in the record about why Mr. Hyler still had it. The assault, what's the connection of the assault to Mr. Franklin? Well, Mr. Schulte wants to sort of take each of these apart and put them in a vacuum. But I'm asking, what is the connection? What's the connection? That he gets assaulted, as he said, at the behest of Mr. Franklin because he was worried about his cooperation. And could it be for another reason? But how does he know it's at the behest of Mr. Franklin? Well, because what Mr. Hyler testified to or told Agent Bowen was that he was told as the assault was commencing, we're doing this basically at the behest of Franklin. And it would be quite a coincidence if he just happens to get assaulted around the same time that he's getting the note, around the same time that that pitch is getting talked to, around the same time that Mr. Franklin's going to his first change of plea hearing to deliver the message he wants to deliver in that first instance. Yeah, because it might not… There's a kind of problem here that, you know, given the circumstances, one could believe that everything these criminals say is a lie. Or you could say, let's put it together and see if it isn't minimally consistent. I mean, if you start in with the view that these are all criminals and we can't believe anything, then the defense is going to win here, aren't they? I think that's right, Judge Boggs. And the other thing we have here is that by the time of Mr. Franklin's sentencing, both Mr. Hyler and Mr. Pitch had testified at Couser's trial. And presumably, based on the jury's conviction, they found those two individuals to be reliable. And Agent Bowen said their statements to him about the substance of the case and about their interactions were internally consistent. He said, when I've talked to them about this case, they've been internally consistent with me about how the robbery unfolded, whose role was what, what Mr. Franklin's involvement was, what Ms. Couser's involvement was. So you had that additional overlay at the time of Mr. Franklin's sentencing as well when the court was addressing the reliability. But didn't the, I mean, the government's upcoming 5K 1.1 motions, I mean, when they provided Mr. Hyler and Mr. Pitch with the additional or a reason to maybe not tell the truth about Mr. Franklin's alleged witness tampering? So we don't think so here, Judge, because they were already cooperating. They'd already signed their plea agreements. Their plea hearings predated Mr. Franklin's. So they're already sort of on board. So there was really no need for them. And they're on board about the robbery, including Mr. Franklin's trial that they thought was going to be happening. And Ms. Couser's trial, which ultimately did happen. So for them to go the extra step of say, oh, and by the way, Mr. Franklin's also tampering with witnesses. There was no indictment for those charges yet. They're already on board as cooperators. So what motivation would they have to go out and create more dirt against Mr. Franklin? I suppose, you know, you could theorize something along those lines, but they're already on board. They're already in sort of the government's camp in terms of their cooperation. So it didn't make any sense that they would just make up another story about Mr. Franklin, especially when they do happen to be similar in the sense that he's leaning on both of them. I've gone well over my time, Your Honors, but I'm happy to answer any additional questions if you have any. Okay, thank you very much. All right, thank you. Let's see, Mr. Huberstown, I'll give you one minute. Thank you, Your Honor. I think I'll clarify one issue that seems to be, there seems to be some confusion in that. And that is the contention that Mr. Franklin told Ariel Couser to go into the house. So we presented the testimony of two witnesses, Samantha Trujillo and Bobette Crenshaw. And it was also corroborated by Ms. Cousen. But essentially, Keelan Franklin and Ariel Couser had a rocky relationship. And he kicked her out on a number of occasions. And that night, he kicked her out. They were living at Samantha Trujillo's trailer at that time. And he says, I don't want you back here. So he dropped her off at Samantha Trujillo's trailer. She gets on the phone. She starts talking. And she contacts the judge. That's what she said. And that's why, and that's, and his story is inconsistent with that. Right. And that's why the, I mean, Bobette Crenshaw testified that she was there for an hour and a half. And so that would have. But that's why it seems strange to think that if he gives the same story he gave at the first plea hearing, it's going to help her. Because it's going to show that he doesn't agree that all of that is true. He thinks that it isn't true. Well, that's why the video, I could have cross-examined him with the video and shown him that his contention was completely false. But that doesn't make him a believable person. It makes him an unbelievable person. Right, which is what I wanted to do. That's not what you want to do. You want him to testify to his first plea as evidence that there was actually no robbery. Yeah. So it doesn't, the pieces don't hang together. That's what's very difficult. Well, they do because his intention was not initially to go there. His intention was to get his money back. And he told these other two guys, you guys stay in the car. And they didn't. But what's the difference what his intention was when, according to her, she had nothing to do with it? Well, it shows that she wasn't a part of this robbery. She wasn't a part of the plan to commit a robbery. Okay, thank you very much. Mr. Shultz. Thank you very much, Your Honor. Your Honors, Pimentel Lopez was decided under a clear error standard. I did go back and review that very briefly. And just to address cooperation. But abuse of discretion incorporates a clear error standard, doesn't it? Yes, Your Honor, it does. That's the fact. That's correct. It goes to the facts, Your Honor. But we do believe this is a de novo review due to the constitutionality of the issues. Regarding cooperation, Your Honor, Mr. Heiler was actively interested in getting a 5K, 1.1 motion that had not been filed prior to his cooperation. And as the court knows, cooperation is to some extent a leap of faith. And that is why you work with your U.S. Attorney's Office. And Mr. Roscoe has an impeccable reputation in Montana. And you know that if he's looking at a 5K for you, he's going to keep his word and he's going to give it to you. That is the greater the assistance, the greater the cooperation, the greater the 5K. So until that is filed, you are actively doing everything you can to increase that benefit. And this statement did lead to additional charges that were dismissed. And there's a very clear motive of currying favor for out-of-court statements that did not meet the minimal condition of reliability standard set forth in Pimentel-Lopez. Okay. Thank you very much. Thank you all for your arguments. Thank you, Your Honor. Arguments. It's a difficult case. United States v. Kauser and Franklin is submitted. We go to St. Giles v. Garland.
judges: Boggs, Berzon, Murguia